IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| vs. | § | Case. No. 4:03cr 144 |
| | § | Judge Davis |
| DONALD TARNAWA, | § | |
| a/k/a Steven D. Schramm, Donald S. | § | |
| Schramm, Steven Dacewicz, Steven | § | |
| Dackewicz, Steven Nettles, Ronald Bengohea, | § | |
| Patrick J. Farrell, Donald Chernsky, | § | |
| Corey Moore, | § | |
| Defendant | § | |

# INDICTMENT

THE UNITED STATES GRAND JURY CHARGES THAT:

## COUNTS ONE THROUGH FIVE

Violation:  Wire Fraud
(18 U.S.C. § 1343)

### A.  INTRODUCTION

At all times relevant to this Indictment:

1.      Defendant DONALD TARNAWA ("TARNAWA") was an individual that lived in Florida, Ohio, California, and Texas.

2.      From April 30, 1996, to March 13, 1997,  TARNAWA was incarcerated in the Florida State Penitentiary, serving a one year, nine month sentence for passing fraudulent checks. During his incarceration, TARNAWA met at least two other convicts who were serving lengthy sentences, specifically Steven E. Schramm and Steven Dackewicz. After TARNAWA was released

from the Florida State Penitentiary, he adopted the identities of these convicts without their knowledge or consent, knowing that their continued imprisonment would impair their ability to discover that TARNAWA was using their identities.

3.     TARNAWA formed and controlled numerous entities, including: BeMass, LLC, a California limited liability company; Dedicated Media, a California corporation; Media Sea, a California corporation; Dallas Net Opts, Inc., a Delaware corporation headquartered in Frisco, Texas; Dallas Net Ops, LLC, a Delaware limited liability company headquartered in Frisco, Texas; Datacadabra, LLC, a Delaware limited liability company headquartered in McKinney and Dallas, Texas; DAST Enterprises, LLC, a Delaware limited liability company headquartered in Frisco, Texas; DAST Motorsports, LLC, a Delaware limited liability company headquartered in Frisco, Texas; Sunkisses, Inc., a Delaware corporation headquartered in Frisco, Texas; and Sunkisses, LLC, a Delaware limited liability company headquartered in Frisco, Texas (collectively "Tarnawa Companies").

4.     "DVDs" are digitalized video discs that contain data, music, or video images, such as movies, in the form of millions of bits of digital information.

5.     "Streaming digital communications" is a term used in the computer software industry for compressing large amounts of data into smaller packages, and then transmitting the compressed data packages through communication wires.  Because the compressed data packages can be transmitted and delivered more efficiently than data packages that have not been compressed, the compressed data can be presented in a continuous, or "streaming," format.  For example, a streaming digital communications process would enable a central computer to deliver digital versions of movies to monitors or television screens without interruption.

6.      "Real- time transmission" is a term used in the computer industry for transmitting data, such as visual images, in a continuous, on-demand format without interruption or delays caused while additional information is being delivered or downloaded to the computer's memory. Such delays are also known as "buffering."

## B. THE SCHEME AND ARTIFICE TO DEFRAUD

7.      In and around September 1997 and continuing through in and around January 2003, TARNAWA devised a scheme and artifice to defraud persons and businesses and to obtain money from them by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing such a scheme, transmitted or caused to be transmitted writings, signs, signals, pictures and sounds by means of wire communication in interstate commerce.

## C. OBJECT OF THE SCHEME AND ARTIFICE

8.  The object of TARNAWA's scheme and artifice was to defraud potential investors and creditors, and to obtain their money and property by falsely representing to them that he had created a new and revolutionary real-time streaming digital communications process that would transmit and deliver DVD-quality movies in real-time over telephone lines instead of specialized cables or sophisticated communications lines.

## D. THE MANNER AND MEANS OF THE SCHEME AND ARTIFICE

It was part of TARNAWA's scheme and artifice that:

The California Scheme

9.      After being released from the Florida State Penitentiary, TARNAWA assumed the name, social security number, date of birth, and identity of Steven Dackewicz, an inmate who TARNAWA had met in the Florida State Penitentiary.

10. Using the assumed and false identity of Steven Dackewicz, TARNAWA formed Dedicated Media, a California corporation.

11. TARNAWA opened personal accounts in the name of Steven Dackewicz and business accounts in the name of Dedicated Media at Washington Mutual Bank in Los Angeles, California, and executed false signature cards in order to establish these accounts.

12. TARNAWA purchased computers, terminals, servers, furniture and other accessories in order to create the appearance that Dedicated Media was a legitimate technology company.

13. TARNAWA identified persons and businesses that were interested in investing in small businesses with potential for high growth, and specifically interested in small businesses that were developing streaming digital communications technology. TARNAWA told the potential investors that he had created a "revolutionary streaming digital communication process" through which he was able to transmit massive amounts of data and deliver real-time video images over telephone wires.

14. Specifically, TARNAWA represented to investors in California that his new process could transmit digital versions of movies (a/k/a "DVD-quality movies") and other types of extremely large data files over standard telephone lines in real time. With this technology, consumers and businesses could order, receive and play movies without interruption and without specialized cables or sophisticated communication lines.

15. On several occasions, TARNAWA demonstrated a computer software program that he represented was his "streaming digital communications process" to potential investors. TARNAWA specifically represented that his "streaming digital communications process" could transmit DVD quality-movies over standard telephone lines in real time. However, TARNAWA,

as he knew, was not transmitting any data over any telephone lines during the demonstration as he had represented. Furthermore, TARNAWA knew that his "streaming digital communications process" could not transmit DVD-quality movies over standard telephone lines in real time.

16. TARNAWA accepted money from individual investors and businesses in exchange for the ownership and control of the streaming digital communications process that he had demonstrated and deposited the money in an account in California in the name of Dedicated Media.

17. When investors demanded access to and control of the streaming digital communications process, TARNAWA ceased doing business as Dedicated Media, ceased using the identity of Steven Dackewicz, and fled from California to Texas.

18. Subsequently, TARNAWA caused millions of dollars of investor funds to be transferred from Dedicated Media to various Tarnawa Companies that TARNAWA controlled.

The Texas Scheme

19. In or about January 2001, TARNAWA moved to Frisco, Texas.

20. Upon moving to Texas, TARNAWA assumed the name, social security number, date of birth and identity of Steven Schramm, another convict whom TARNAWA had met in the Florida State Penitentiary.

21. Using the assumed and false identity of Steven Schramm, TARNAWA formed Dallas Net Opts, Inc., a Delaware corporation headquartered in Frisco, Texas, and Dallas Net Ops, LLC, a Delaware limited liability company headquartered in Frisco, Texas. TARNAWA later changed the name of Dallas Net Ops, LLC, to Datacadabra, LLC. TARNAWA also formed DAST Enterprises, LLC, a Delaware limited liability company headquartered in Frisco, Texas; Sunkisses, Inc., a Delaware corporation headquartered in Frisco, Texas; and, Sunkisses, LLC, a Delaware

limited liability company headquartered in Frisco, Texas, using the assumed and false identity of Steven Schramm.

22.     Using the assumed and false identity of Steven Schramm, TARNAWA opened personal bank accounts in the name of Steven Schramm and opened corporate bank accounts in the name of various Tarnawa Companies. TARNAWA executed false signature cards in order to open these accounts.

23.     TARNAWA purchased computers, terminals, servers, furniture and other accessories in order to create the appearance that Dallas Net Ops and Datacadabra were legitimate technology companies.

24.     As he had done in California, TARNAWA identified potential investors in Texas that were interested in investing in streaming digital communications technology.

25.     TARNAWA represented to several investors in Texas that he had created a revolutionary new streaming digital communications process, and could transmit DVD-quality movies and other extremely large data files over standard telephone lines in real time.

26.     TARNAWA again represented that he would demonstrate the streaming digital communication process to a potential investor. However, TARNAWA, as he knew, was not transmitting any data over the telephone lines during the demonstration as he had represented. Furthermore, TARNAWA knew that his "streaming digital communications process" could not transmit DVD-quality movies over standard telephone lines in real time.

27.     In order to disguise the source of funds and his identity, TARNAWA repeatedly transferred funds between and among various Tarnawa Companies' bank accounts and TARNAWA's personal bank accounts.

28. TARNAWA withdrew and used investors' funds for personal expenses including residential real estate, approximately 100 personal automobiles, jewelry, and other personal items.

29. When investors demanded access and control of the streaming digital communications process, and as law enforcement contacted TARNAWA regarding his use of a false identity, TARNAWA ceased doing business as Dallas Net Ops and Datacadabra and fled Texas.

## D. THE WIRING IN EXECUTION OF THE SCHEME AND ARTIFICE

30. In the Eastern District of Texas, on or about the following dates, TARNAWA, for the purpose of executing and carrying out the scheme and artifice, and for the purpose of attempting to do so, did knowingly and willfully cause to be transmitted by means of wire, radio and television communication in interstate and foreign commerce writings, signals, signs, pictures and sounds on the following occasions:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 1 | 1/30/01 | $3,000,000 electronic funds transfer from Dedicated Media account at Washington Mutual in California to a Sunkisses account at ChaseBank in Texas |
| 2 | 9/6/01 | Invoice #24036 sent by facsimile transmission from TARNAWA while he was in Texas to an investor in California |
| 3 | 12/18/01 | Electronic mail sent by TARNAWA while he was in Texas to an investor in California soliciting funds and containing fraudulent representations as to the technology and TARNAWA's work on it |
| 4 | 12/30/01 | Electronic mail from TARNAWA while he was in Texas to an investor in California containing fraudulent representation regarding TARNAWA's work on the technology |
| 5 | 4/22/02 | Electronic mail from TARNAWA while he was in Texas to an investor in California containing false representation regarding TARNAWA's financial situation and involvement with the technology |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS SIX THROUGH TEN

Violation: 18 U.S.C. §1344
(Bank Fraud)

The Grand Jury further alleges that:

## A. INTRODUCTION

31. The Grand Jury realleges and incorporates by reference the allegations set forth in Paragraphs 1 - 6 of this Indictment.

32. First United Bank of Durant ("First United") was a federally insured financial institution located in Durant, Oklahoma.

33. TARNAWA, using the false name and identity of Steven Schramm, established and maintained several bank accounts with First United in Durant, Oklahoma, in the name of Steven Schramm and various Tarnawa Companies.

## B. SCHEME AND ARTIFICE TO DEFRAUD

34. On or about January 2002 through on or about September 2002, in the Eastern District of Texas and elsewhere, TARNAWA knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution, and to obtain the money, funds, credits and assets owned by or under the control of First United by means of false and fraudulent pretenses, representations and promises.

## C. MANNER AND MEANS OF THE SCHEME AND ARTIFICE

It was part of the manner and means of the scheme and artifice to defraud that:

35. On or about December 2001, TARNAWA met Greg Massey, President of First United, at a restaurant in McKinney, Texas. During this meeting, TARNAWA claimed to be Steven

Schramm and told Massey that he had recently sold his company in California for approximately $500 million.

36.     On or about January 24, 2002, TARNAWA submitted fraudulent financial statements to First United, falsely representing his name, his personal net worth, and the net worth of one of the Tarnawa Companies.

37.     TARNAWA submitted a false Form W-2 from BeMass, LLC, stating that his annual, taxable income for fiscal year 2001 was $750,000.

38.     Subsequently, TARNAWA submitted a false 2001 Form 1040, United States Individual Income Tax Return, to First United. This tax return reported the wages claimed on the false Form W-2 from BeMass, LLC, previously submitted to First United.

39.     On or about February 22, 2002, and March 7, 2002, TARNAWA executed false signature cards in order to open accounts in the name of Steven Schramm and various Tarnawa Companies at First United.

40.     On or about April 2002, TARNAWA submitted a fraudulent investment account statement to First United purporting to be issued by J.P. Morgan. Through this statement, TARNAWA falsely represented that Sunkisses, Inc. maintained an investment account at J.P. Morgan.

## D. ACTS IN EXECUTION OF THE SCHEME AND ARTIFICE

41. On or about the following dates, within the Eastern District of Texas and elsewhere, for the purpose of executing the scheme and artifice, TARNAWA knowingly and willfully executed loan applications for the following amounts and purposes:

| COUNT | DATE | AMOUNT | STATED PURPOSE OF LOAN |
|-------|------|--------|------------------------|
| 6 | 2/20/2002 | $ 285,767.90 | Purchase 2002 Lamborghini |
| 7 | 2/21/2002 | $ 175,035.00 | Purchase 1999 Fountain Boat and 2000 Myco Trailer |
| 8 | 3/19/2002 | $ 272,935.00 | Purchase 2002 Ferrari |
| 9 | 5/30/2002 | $1,080,000.00 | Purchase 2300 Creekridge Drive, Frisco, Texas |
| 10 | 7/02/2002 | $ 232,091.44 | Purchase 2002 Bentley |

All in violation of Title 18, United States Code, Section 1344.

## COUNT ELEVEN

Violation: 18 U.S.C. §1344
(Bank Fraud)

The Grand Jury further alleges that:

## A. **INTRODUCTION**

42. The Grand Jury realleges and incorporates by reference the allegations set forth in Paragraphs 1 - 6 of this Indictment.

43. First Bank & Trust of Dallas ("First Bank") in Dallas, Texas was a federally insured financial institution located in Dallas, Texas.

44. TARNAWA, using the false name and identity of Steven Schramm, opened and maintained an account with First Bank, in the name of Datacadabra, LLC.

## B. **SCHEME AND ARTIFICE TO DEFRAUD**

45. On or about January 2002 through on or about September 2002, in the Eastern District of Texas and elsewhere, TARNAWA knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution, and to obtain the money, funds, credits and assets owned by or under the control of a financial institution by means of false and fraudulent pretenses, representations and promises.

## C. **MANNER AND MEANS OF THE SCHEME AND ARTIFICE**

It was part of the manner and means of the scheme and artifice to defraud that:

46. On or about August 2002, TARNAWA performed a fraudulent presentation of his non-existent computer technology for representatives of First Bank for the purpose of securing a loan.

47.     On or about August 2002, TARNAWA provided false collateral information to First Bank for the purpose of securing a loan.

48.     On or about September 4, 2002, TARNAWA executed a false signature card in order to open an account in the name of Datacadabra, LLC, at First Bank.

## D. ACTS IN EXECUTION OF THE SCHEME AND ARTIFICE

49.     On or about the following date, within the Eastern District of Texas and elsewhere, for the purpose of executing the scheme and artifice to defraud a financial institution, specifically First Bank, TARNAWA knowingly and willfully executed a loan application for the following amount and purpose:

| COUNT | DATE   | AMOUNT    | STATED PURPOSE OF LOAN          |
|-------|--------|-----------|---------------------------------|
| 11    | 9/3/02 | $500,000  | Establish a working capital line |

In violation of Title 18, United States Code, Section 1344.

## COUNTS TWELVE THROUGH THIRTY-ONE

Violation: 18 U.S.C. §1957(a)
(Money Laundering)

## A.    INTRODUCTION

50.    The Grand Jury realleges and incorporates by reference paragraphs 1 through 6 (including wire fraud scheme) of this Indictment.

51.    On or about the following dates, in the Eastern District of Texas and elsewhere, TARNAWA knowingly engaged in and attempted to engage in the following monetary transactions, each transaction affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, which was derived from specified unlawful activities, namely wire fraud and bank fraud, in violation of Title 18, United States Code, Sections 1343 and 1344:

| COUNT | DATE | AMOUNT OF TRANSACTION | DESCRIPTION OF TRANSACTION |
|---|---|---|---|
| 12 | 2/1/01 | $3,000,000.00 | Transfer of funds referenced in Count 1 from Sunkisses, Inc. Checking Account to Sunkisses, Inc. Money Market Account |
| 13 | 2/6/01 | $100,000.00 | Purchase of 50 Piccadilly Park, Frisco, Texas, with funds from Sunkisses, Inc. Money Market Account |
| 14 | 2/9/01 | $545,000.00 | Transfer from Dedicated Media Account to Sunkisses, Inc. Checking Account |
| 15 | 2/12/01 | $2,450,000.00 | Purchase of 50 Piccadilly Park, Frisco, Texas, with funds from Sunkisses, Inc. Money Market Account |
| 16 | 2/28/01 | $355,000.00 | Transfer from Dedicated Media Account to Sunkisses, Inc. Checking Account |
| 17 | 3/8/01 | $300,000.00 | Transfer from Sunkisses, Inc. Money Market Account to Sunkisses, Inc. Checking Account |

| COUNT | DATE | AMOUNT OF TRANSACTION | DESCRIPTION OF TRANSACTION |
|---|---|---|---|
| 18 | 3/9/01 | $198,124.50 | Purchase of Jewelry from Bachendorf's Jewelry with funds from Sunkisses, Inc. Checking Account |
| 19 | 3/10/01 | $35,000.00 | Purchase of Stonebriar Country Club Membership with funds from Sunkisses, Inc. Checking Account |
| 20 | 4/3/01 | $178,171.63 | Purchase of 11403 Eaglebend Lane, Frisco, Texas, with Funds from Sunkisses, Inc. Checking Account |
| 21 | 5/7/01 | $468,116.94 | Transfer from Dedicated Media Account to Sunkisses, Inc. Checking Account |
| 22 | 5/7/01 | $422,848.31 | Purchase of Jewelry from Bachendorf's Jewelry with funds from Sunkisses, Inc. Checking Account |
| 23 | 7/16/01 | $25,000.00 | Transfer from Sunkisses, Inc. Checking Account to DAST Enterprises, LLC Checking Account |
| 24 | 7/20/01 | $24,000.00 | Transfer from Dedicated Media Account to DAST Enterprises, LLC Checking Account |
| 25 | 7/26/01 | $119,000.00 | Transfer from Dedicated Media Account to DAST Enterprises, LLC Checking Account |
| 26 | 8/10/01 | $24,000.00 | Transfer from Dedicated Media Account to DAST Enterprises, LLC Checking Account |
| 27 | 8/11/01 | $122,871.95 | Purchase of Lamborghini from Motorcars International with funds from DAST Enterprises, LLC Checking Account |
| 28 | 8/21/01 | $110,415.00 | Purchase of Jewelry from Bachendorf's Jewelry with funds from DAST Enterprises, LLC Checking Account |
| 29 | 3/1/02 | $400,000.00 | Transfer from Steve Schramm Account at First United Bank to DAST Enterprises, LLC Checking Account |
| 30 | 3/5/02 | $55,000.00 | Purchase of Mercedes Benz from Ewing Autohaus with funds from DAST Enterprises, LLC Checking Account |

| COUNT | DATE | AMOUNT OF TRANSACTION | DESCRIPTION OF TRANSACTION |
|-------|------|------------------------|-----------------------------|
| 31 | 5/17/02 | $1,000,000.00 | Transfer from DAST Enterprises, LLC Checking Account to Steve Schramm Account at First United Bank |

All in violation of Title 18, United States Code, Section 1957(a)

## NOTICE OF INTENTION TO SEEK CRIMINAL FORFEITURE

### Criminal Forfeiture Pursuant to 18 U.S.C. § 982(a)(1) & (a)(2)

As the result of committing one or more of the foregoing offenses alleged in Counts 1 through 31 of this Indictment, TARNAWA, Defendant herein, shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1) & (a)(2), all property, real and personal, involved in the aforementioned offenses and all property traceable to such property, including but not limited to the following:

1. **MONEY JUDGEMENT**

A sum of money equal to $27,636,962 in United States currency, representing the total amount of proceeds obtained as a result of the commission of the offenses alleged in Counts 1 through 31 of this Indictment.

2. **JEWELRY and WATCHES**

Precious gemstones, precious metals, watches, jewelry, and precious or valuable furnishings, which includes the following purchased from the Harry Bock Company dba Bachendorf's Jewelers:

| DATE PURCHASED | DESCRIPTION |
| --- | --- |
| 3/5/01 | Rolex (P508702) |
| 3/5/01 | Rolex (P417159) |
| 3/6/01 | Breitling Watch (K1305547) |
| 3/6/01 | Watch (K13050/357) |
| 3/6/01 | Various Crystal |
| 3/9/01 | Rolex (A666474) |
| 3/9/01 | Rolex (P198847) |

| | |
|---|---|
| 3/16/01 | Rolex (P194656) |
| 3/16/01 | Rolex (W793970 |
| 3/19/01 | Rolex (P104636) |
| 3/19/01 | Rolex (P535037) |
| 3/19/01 | Rolex (R791588) |
| 3/19/01 | Rolex (R116568) |
| 3/21/01 | Various China/Crystal |
| 3/24/01 | Rolex (A915734) |
| 3/28/01 | Rolex (P194825) |
| 3/28/01 | Rolex (P185187) |
| 4/5/01 | Rolex (P389270) |
| 4/5/01 | Rolex (P674189) |
| 4/5/01 | Watch |
| 4/13/01 | Rolex (P900453) |
| 4/13/01 | Rolex (P532202) |
| 4/16/01 | Rolex (P357954) |
| 4/16/01 | White Gold Diamond Necklace (18.39 ct) |
| 4/16/01 | Diamond Earstuds (.94 ct) |
| 4/16/01 | Diamond Angel Necklace (2.64/.95/.81/.08 ct) |
| 4/20/01 | Lady's Platinum Diamond Bracelet (33 diamonds-17 ct) |
| 4/20/01 | Lady's Yellow Gold Diamond Ring (1.07/2.44/.40 ct) |

| | |
|---|---|
| 4/24/01 | Rolex (P155625) |
| 4/27/01 | Rolex (P196942) |
| 4/27/01 | Rolex (P196939) |
| 5/5/01 | Platinum Ring (1.86 cts) |
| 5/5/01 | Marquise Diamond (6.0 ct) |
| 5/7/01 | Rolex (P198217) |
| 5/7/01 | Diamond Bezel for Rolex (P198217) |
| 5/7/01 | Rolex (P354491) |
| 5/7/01 | Platinum Diamond Necklace (11.43 ct) |
| 5/7/01 | Rolex (A663722) |
| 5/7/01 | White Gold Diamond Earstuds (2 - 4.04 ct) |
| 5/7/01 | Globe |
| 5/31/01 | Rolex (P199516) |
| 5/31/01 | Rolex (P900509) |
| 5/31/01 | Rolex (P197750) |
| 5/31/01 | Rolex (P447720) |
| 5/31/01 | Rolex (P421637) |
| 5/31/01 | Rolex (W036866) |
| 5/31/01 | Rolex (P194437) |
| 5/31/01 | Rolex (R116568) |
| 5/31/01 | Male Platinum Diamond Ring (2.04 ct) |
| 6/14/01 | Rolex (P650886) |
| 6/14/01 | Rolex (P191559) |

| | |
|---|---|
| 6/14/01 | Rolex (P817789) |
| 6/14/01 | Men's White Gold Diamond Band (1.59 ct) |
| 6/15/01 | White Gold Omega (18k) |
| 6/30/01 | Watch Winder |
| 6/30/01 | Yellow Gold Ulysse Nardin Watch (321-28) |
| 6/30/01 | White Gold Ulysse Nardin Watch (320-22) |
| 7/6/01 | Platinum Diamond Ring (3.42 ct) |
| 7/6/01 | Yellow Gold Diamond Ring (4.3 cts) |
| 7/6/01 | Platinum Diamond Ring with Baguettes (3.12 ct) |
| 7/10/01 | Lady's Platinum Diamond Bracelet (8.95 ct) |
| 7/10/01 | Lady's Platinum Diamond Bracelet (1.70 ct) |
| 7/10/01 | White Gold Diamond Earstuds (2 - .99 ct) |
| 7/10/01 | Watch Winder |
| 7/10/01 | White Gold Diamond Earstuds (2 - 2.39 ct) |
| 7/10/01 | Yellow Gold Bracelet for Ulysse Nardin Watch |
| 7/27/01 | Yellow Gold Emerald Cut Diamond Ring (7.34 ct) |
| 10/24/01 | Emerald Cut Diamond (7 ct)52217 |
| 1/3/02 | 2 Men's Rings |
| 1/17/02 | Diamond Bracelet |
| 1/29/02 | Diamond Necklace |
| 2/3/02 | Diamond Ring (10.05/2-3.44 ct) |
| 2/14/02 | Platinum Diamond Earrings (3.01 ct; 3.03 ct) |
| 2/14/02 | White Gold Diamond Necklace |

| | |
|---|---|
| 3/1/02 | Rolex (P667410) |
| 3/14/02 | Rolex (K271364) |
| 3/14/02 | Rolex (P413818) |
| 3/14/02 | Necklace |
| 3/14/02 | Star Necklace |
| 3/14/02 | Platinum Band |
| 3/14/02 | Cross |
| 3/14/02 | Diamond (13.29 ct) |
| 3/14/02 | Princess Diamond (10 ct) |
| 4/7/02 | Moire Bowl (Crystal) |
| 4/29/02 | Rolex (W053101) |
| 4/29/02 | Lady's Rolex (V313692) |
| 4/29/02 | Breitling Watch (B626A6936001) |
| 4/29/02 | Money Clip |
| 4/29/02 | Star Diamond Earrings (1.30 ct) |
| 4/29/02 | Yellow Gold Bracelet |
| 4/29/02 | 2 Platinum and Gold Rings |
| 4/29/02 | Diamond Ring (2.62 ct) |
| 4/29/02 | Diamond Earrings (4.43 ct) |
| 4/29/02 | Cross |
| 4/29/02 | Diamond Earrings |
| 4/29/02 | Princess Diamond (10 ct) |
| 9/26/02 | Marquise Diamond Ring (6.0 ct) |

9/26/02                          Diamond (13.29 ct)

## 3.    MISCELLANEOUS PROPERTY

All furniture, computer and electronic equipment, and all other assets that are owned by or acquired for the operation of the Tarnawa Companies.  Said property belonging to the Tarnawa Companies and Donald Tarnawa.

## 4.    SUBSTITUTE ASSETS

If any of the property described above as being subject to forfeiture, as a result of any act or omission of Defendant -

      a. cannot be located upon the exercise of due diligence;

      b. has been transferred or sold to, or deposited with a third person;

      c. has been placed beyond the jurisdiction of the court;

      d. has been substantially diminished in value; or

      e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of Defendant up to the value of the above forfeitable property, including but not limited to all property, both real and personal owned by Defendant, including but not limited to the following:

- 2003 Dodge Truck, Vehicle Identification Number 3D3MU48603G708777, Colorado License Number 502 FTS. Said property belonging to Gustav Reisner;

- 2003 Lincoln, Vehicle Identification Number 5LMFU28R33LJ15183, Colorado License Number 533 IDH.  Said property belonging to Gustav Reisner.

By virtue of the commission of the offenses alleged in Counts 1 through 31 of this Indictment, any and all interest the Defendant has in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 982(a)(1) & (a)(2).

All in accordance with Title 18, United States Code, Section 982(a)(1), and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

FOREPERSON OF THE GRAND JURY

MATTHEW D. ORWIG
United States Attorney

ARNOLD A. SPENCER
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| vs. | § | Case. No. 4:03cr |
| | § | Judge |
| DONALD TARNAWA, | § | |
| a/k/a Steven D. Schramm, Donald S. | § | |
| Schramm, Steven Dacewicz, Steven | § | |
| Dackewicz, Steven Nettles, Ronald Bengohea, | § | |
| Patrick J. Farrell, Donald Chernsky, | § | |
| Corey Moore | § | |
| Defendant | § | |

## NOTICE OF PENALTY

### COUNTS ONE THROUGH FIVE

Violation:        18 U.S.C. §1343
(Wire Fraud)

Penalty:        A fine of not more than $250,000
and/or imprisonment for not more
than twenty (20) years; and a period
of supervised release of not more
than 3 years;

Special Assessment:    $100 each count.

### COUNTS 6 THROUGH 11

Violation:        18 U.S.C. §1344
(Bank Fraud)

Penalty:        A fine of not more than $1,000,000
and/or imprisonment for not more
than thirty (30) years; and a period of
supervised release of not more than 5
years;

Special Assessment:    $100 each count.

## **COUNTS 12 THROUGH 31**

Violation:              18 U.S.C. §1957
                        (Money Laundering)

Penalty:                A fine of not more than $250,000 or
                        more than twice the amount of
                        criminally derived property involved
                        in the transaction, and/or
                        imprisonment for not more than ten
                        (10) years; and a period of
                        supervised release of not more than 3
                        years;

Special Assessment:         $100 each count.